BRANDON LEE JONES )
and DEVIN JONES, )
     *Plaintiffs*, )    No. 1:19-cv-00259
 )
v. )    Judge Christopher H. Steger
 )
OFFICER SKYLER LONG, )
OFFICER CUBA, )
OFFICER ABBETT; and the )
CITY OF CHATTANOOGA, )
     *Defendants*. )

## MEMORANDUM AND ORDER

### I.    Introduction

On the evening of September 9, 2018, Chattanooga City Police ("CPD") Officers were dispatched to a local bank to investigate after a silent alarm was triggered at the bank's ATM. This lawsuit arose from the CPD Officers' interaction with Plaintiffs, Brandon and Devin Jones, who were sitting in the only automobile in the bank parking lot when the police arrived to investigate. Plaintiffs refused to provide a driver's license to the police despite repeated requests. Because they refused to comply with these requests, police ultimately ordered Mr. and Ms. Jones to exit their vehicle. Plaintiffs refused this command. Consequently, the police forcibly removed Plaintiffs from the vehicle and arrested Plaintiff Brandon Jones.

Plaintiffs initiated this lawsuit against Officers Skyler Long, Juan Cuba, Alvin Abbett (collectively, "Defendant Officers") and the City of Chattanooga (the "City") under 42 U.S.C. § 1983 asserting claims for denial of substantive due process in violation of the Fourteenth Amendment and claims for unlawful seizure and use of excessive force in violation of the Fourth and Fourteenth Amendments. Defendant Officers and the City have filed separate motions for

summary judgment. For the reasons stated herein the Court finds there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. Accordingly, the Defendant Officers' Motion for Summary Judgment [Doc. 186] and the City's Motion for Summary Judgment [Doc. 184] are **GRANTED**.

## II.    Facts

As the Court must when reviewing a motion for summary judgment, the Court views all facts and reasonable inferences drawn therefrom in a light most favorable to the non-moving party—in this case, Mr. and Ms. Jones. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports v. Eliadis Inc.,* 253 F.3d 900, 907 (6th Cir. 2001). Where there is video of the incident, however, the Court may not adopt a version of the facts that is blatantly contradicted by unaltered video which clearly depicts the event in dispute. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). But if there are gaps in the video or the video could support more than one interpretation of events, then the Court must view those gaps and uncertainties in the light most favorable to the non-moving party. *LaPlante*, 30 F.4th at 578 (citing *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)). In the instant case, the Defendant Officers were each wearing body cameras which captured most of the events giving rise to this action. Where the Plaintiffs' version of facts is directly contradicted by the recordings from those body cameras, the Court will so note. Where there are gaps in the recordings or room for interpretation, the Court will rely on the Plaintiffs' version of events. With these principles in mind, the Court makes the following findings of fact:

On September 9, 2018, at 9:11 p.m., Eastern Time, Officer Skyler Long—in full police uniform, including his duty belt and driving a marked patrol car—was dispatched to the First Volunteer Bank of Tennessee ("First Volunteer Bank") on Gunbarrel Road in Chattanooga,

Tennessee, to investigate a silent alarm which had been tripped at the bank's ATM. Officer Long did not activate his blue lights or siren. It was dark and raining outside. [Long dep. at 25-28; Long BC 1:17:47Z ][1]

Defendant Officers had received multiple emails from CPD over the past several weeks and months alerting them to various credit card skimming and fraud schemes at banks in that area. Officer Long was aware that ATMs at various branches of the First Volunteer Bank in that area had been robbed recently with skimmer devices. [Long dep. at 38-42].

When Officer Long arrived at First Volunteer Bank, the Jones' vehicle, a four door sedan, still running, was the only vehicle in the bank parking lot and was sitting under a metal awning at the closed drive-through teller window and the night deposit box. [Long dep. at 30-31; Doc. 200-2, D. Jones dep. at 21; Long BC 1:17:50Z]. Mr. Long was in the driver's seat, Ms. Jones, his wife, was in the front passenger seat, and their three-year-old daughter was asleep in a children's car seat in the back. Prior to Officer Long's arrival, the Joneses had pulled up and taken a deposit slip from the night deposit box. Officer Long, however, did not realize that a person could make a deposit at night on a Sunday; he did not know that a night deposit box was located immediately next to the teller window [Long dep. at 45, 85 -86]; and he did not know that the ATM was located around the corner from the closed drive-through teller window. [Long. Dep. at 29-30]. Long parked his police vehicle in the bank lot, behind the Jones vehicle and off to the side, 15 to 25 feet away so as not to block Plaintiffs' vehicle. [Long BC 1:17:40Z].

_____

[1] Each officer's recording from his body camera will be cited as follows: "Officer's Name, BC time." The time stamps on the officers' body cameras are in Zulu time. Zulu Time is a military time zone fixed at the prime meridian. *See* timeanddate.com, https://www.timeanddate.com/worldclock/timezone/zulu (last visited 8/30/2022). Consequently, all time stamps on the officers' recordings are synchronized with one another.

The Jones vehicle windows were tinted, and Long could not see inside the vehicle until he walked up next to it. [Long dep. at 31-32]. As Long approached the vehicle from the passenger side, he stood next to, but partially behind, the front passenger side window and shined a flashlight through the tinted window to see into the car. [Long BC 1:17:55Z]. Mr. and Ms. Jones testified in their respective depositions that they did not see Officer Long's patrol car and they could not see Officer Long clearly because of where he was standing, so they did not know he was a police officer. [B. Jones dep. at 20-21; D. Jones dep. at 16.]

Officer Long held up his right hand and pointed downward rapidly several times with his finger to indicate to the occupants that they should lower the window. In response, Mr. Jones immediately lowered the window on the passenger side about three or four inches. [B. Jones dep. at 17, Long BC 1:18:00Z ]. Long observed Ms. Jones in the passenger seat with a large amount of cash—later determined to be $300.00—scattered across her lap. [Long dep. at 40]. Although Mr. Jones is barely audible on the recording, Officer Jones' body camera does pick up Mr. Jones saying:

Mr. Jones: *Can I help you, officer?*[2]

Officer Long: (Friendly) *Hi, what's going on?*

[Long BC 1:18:05Z].

Unfortunately, most of what Mr. and Ms. Jones said after this initial interaction cannot be discerned from the audio picked up by Officer Long's body camera, but it is undisputed by the parties that Plaintiffs responded they were making a night deposit at the bank. Ms. Jones held up a piece of paper, later determined to be a deposit slip, to show Officer Long. [Doc. 202-2, D. Jones

---

[2] Direct quotes within this dialogue are italicized. The Court notes that Mr. Jones immediately recognized that he was talking with a police officer when he addressed him as "officer."

dep. at 18]. Officer Long's body camera continued to capture Officer Long's side of the conversation he had with the Joneses.

Officer Long: *You're able to do that this time of the night?*

Mr. Jones' response is unintelligible on the video. Officer Long testified in his deposition that Mr. Jones responded, "sir, it says after hours deposit."

[Long dep. at 101].

Officer Long: *Okay, well the key holder for this bank, they called us, they said that—it seemed like someone was tampering with some sort of alarm or uh - something tripped, so that's why I'm here. Just trying to check it out.*

Ms. Jones: Unintelligible.

Officer Long: *Yea, that's when I came out.*

Mr. Jones: Unintelligible.

Officer Long: *Okay, do you have your driver's license on you at least?*

Mr. Jones: Unintelligible.

Officer Long: *Okay, let me see that.*

Mr. Jones: Unintelligible.

Officer Long: *I'm sorry?*

[Long BC 1:18:05 - 1:19:10Z].

Mr. Jones: Unintelligible; however, Mr. Jones testified in his deposition that he was questioning the need for him to provide identification. [B. Jones dep. at 19].

Officer Long: (Calmly). *Yea, it doesn't matter. I mean you're still operating a vehicle. Ah, so I just need to make sure everything's okay so if you've got your driver's license on you and insurance and it's all valid we [sic] good to go.*

Mr. Jones: Unintelligible.

Officer Long: (Frustrated) *Because you're operating a vehicle.*

Mr. Jones: Unintelligible

Officer Long: (Calmly and firmly) *It doesn't matter. It doesn't matter.*

Mr. Jones: Unintelligible:

Officer Long: (Frustrated). *Are we going to play this game like or are you just going to show me your driver's license and insurance?*

Mr. Jones: unintelligible.

Officer Long: *Alright. Alright.*

Mr. Jones: unintelligible.

Officer Long: (Frustrated) *Now I want you to step out of the car for me. If we're going to play this game, we'll play this game. So step out of the car for me.*

[Long BC 1:19:10 - 1:19:48Z].

Mr. Jones: Unintelligible. According to Mr. Jones, he did not provide his driver's license because "it was not a traffic stop" and because he did not feel safe. [B. Jones dep. at 26, 143]. Ms. Jones also stated in her deposition that they did not feel safe and that the situation seemed "sketchy." [D. Jones dep. at 21]. Instead, Mr. Jones asked why he needed to show Officer Long his driver's license. [B. Jones at 19, 26-27, 143]. Officer Long did not answer Mr. Jones' question. Instead, Officer Long can be heard calling for backup, indicating that he had two people at the bank stating they were trying to make a deposit and who were refusing to provide identification and refusing to step out of the car. Officer Long stood by the Jones vehicle waiting for back up. In the video, one can see through the window that Ms. Jones is writing on a paper, later determined to be a deposit slip, on the dashboard. Officer Long then walked to the back of the vehicle and called in the license plate. He noticed at that time that the vehicle's registration was expired. Long walked back to the passenger side of the vehicle to speak with Mr. Jones.

[Long BC 1:19:48 - 1:21:26Z].

Officer Long: *Also your tags are expired.*

Mr. Jones: Unintelligible.

Officer Long: *Okay.*

Mr. Jones: Unintelligible.

Officer Long: (Frustrated, louder). *Sir are you going to hand me your driver's license? Are you going to step out of the car? Are you gonna work with me?*

Mr. Jones: Unintelligible.

Officer Long: *Like I said if you'd just working with me we'd be on our way, but you're not working with me right now.*

Mr. Jones: Unintelligible.

Officer Long: *Okay. Well I'm here now and I've asked for your driver's license.* The Joneses talk over Officer Long - unintelligible). *And you're refusing to . . .*

Mr. Jones: Unintelligible.

Officer Long: (Frustrated, louder) *Like I said, you are operating a vehicle. You are over at a bank after hours.* (Mr. Jones talking - unintelligible). *We got an alarm called for police to come out and check the residence which is what I'm doing.* Mr. Jones is talking - unintelligible. *That's, That's fine, but the fact that there's been an alarm that's been triggered, that's why we're here.*

Mr. Jones: Unintelligible.

Officer Long: *Okay, so if you understand then you need to cooperate with me.*

Mr. Jones: Unintelligible.

Officer Long: (Irritated.) *No you're not. I've asked you to step out of the vehicle. I've asked to see some identification. . . .* (Mr. Jones is talking - unintelligible) *. . . You've not produced these things for me.*

Mr. Jones: Unintelligible.

Officer Long: (Irritated). *Yea, according to case law, you actually have to step out of the vehicle when an officer has the right to pull you out of the vehicle. . . .* (Mr. Jones is talking - unintelligible) *. . . I just stated. . .*

Mr. Jones: Unintelligible.

Officer Long: *Right now, yes you are.*

Mr. Jones: Unintelligible.

Officer Long: (Irritated) *I didn't say you were under arrest. I said you were being detained 'til I figure out what's going on.*

Mr. Jones: Unintelligible.

Officer Long: (Irritated.) *You just asked me what? I can't even hear you.*

Mr. Jones: Unintelligible.

Officer Long: (Irritated.) *And I said no, I said you are detained for this moment in time. Yes, you are.*

Mr. Jones: Unintelligible.

At this point, Officer Cuba arrived and walked up to the Jones vehicle. Officer Abbett arrived moments later. Officer Abbett stood in between the driver's side door of the Jones vehicle and the bank. The space in between the vehicle and the bank was not wide enough for a car door to open fully.

[Long BC 1:21:26 - 1:23:06Z; Cuba BC 1:22:55 - 1:23:06Z; Abbett BC 1:23:02Z].

Officer Cuba, wearing his police uniform, stood in front of the passenger side window in full view of the Joneses. Officer Cuba leaned down to the front passenger window to speak to the Joneses:

Officer Cuba: (Calm and friendly) *Hey, hey, you guys go ahead and step outside of the vehicle.*

Mr. Jones lowered the passenger side window six to eight inches.

Mr. Jones: Unintelligible.

Office Cuba: (Calmly) *We are telling you to get out of the vehicle . . .* (Mr. Jones is talking - unintelligible) *. . . Okay you are refusing to open the door . . .* (Mr. Jones is talking - unintelligible) *. . . you are refusing to give us your ID . . .* (Mr. Jones is talking - unintelligible) *. . . You tell me, you have a (unintelligible) right? We're either going to make [sic] ourselves in, break the window, or force ourselves in one way or another, you're coming out one way or another.* Mr. Jones raised the window up several inches. Mr. Jones was talking – unintelligible . . . *Think about your child at this moment. Do you understand? Think about your child at this moment.*

Officer Cuba : (Calmly, while putting his hand on top of the window glass) *Ma'am. Open the door*, *open the door, please.* Officer Long put his baton in the window to prevent it from being closed completely. The window was open about three inches. Officer Cuba said six more times calmly, *ma'am, open the door.* Mr. Jones continued talking - unintelligible.

[Long BC 1:23:06 - 1:24:18Z; Cuba BC 1:23:06 - 1:24:17Z].

> Officer Cuba: (Calmly). *Ma'am, if you don't open the door, CPS[3] is going to be contacted to come get your kid. You both are riding. You have that option, if you want to think about your kid you have that option.*

> Mr. Jones: Mr. Jones said something about an identification but his 20 second response is mostly unintelligible. During this conversation, Officer Abbett also asked Mr. Jones for his identification.

> Officer Abbett: (Calmly) *Sir, it's real easy. Just give us your ID. Okay, okay, let me see your ID, okay?* [Abbett BC 1:24:36Z]. Officer Cuba then reached inside the window, unlocked the passenger side door, and opened it.

[Long BC 1:24:18- 1:24:49Z; Cuba BC 1:24:18 - 1:24:49Z ].

> Officer Long: (Firmly) *Alright. Get out of the car.* Officer Long reached for Ms. Jones' wrists. He took her right wrist, but Ms. Jones was leaning toward Mr. Jones and pulled away, her left arm stretched out toward Mr. Jones.

> Mr. and Ms. Jones: (Very loudly) *HEY, HEY, HEY, HEY, HEY!*

> Officer Long: (Loudly) *Get out of the car. Take your hands off her right now! Get your hands off her!*

Officer Long and Officer Cuba contend that Mr. Jones had grabbed Ms. Jones and was holding her by her head and upper body. [Long's Use of Force Report; Cuba dep. at 95]. Mr. and Ms. Jones contend Mr. Jones did *not* hold onto her. [B. Jones dep. at 32-33, D. Jones dep. at 31]. The video from the recordings taken by the Defendant Officers' body cameras neither confirms nor refutes either contention because the video does not capture the upper portion of Ms. Jones' body during this critical moment.

> Ms. Jones: (Very loudly) *WHOA, WHOA, WHOA, WHOA, WHOA, WHOA, WHOA!*

> Officer Abbett: (Calmly from the other side of the vehicle) *Sir, sir, open the door, get out, get out of this side, buddy.*

---

[3] CPS is Child Protective Services.

Officer Cuba reached in with his left hand and grasped Ms. Jones' right wrist as Officer Long released her right wrist and grasped her left wrist. As Officers Long and Cuba tried to pull her toward them, she leaned away from the Officers into her husband while shouting. She then suddenly lurched forward, the upper side of her head hitting the doorframe. As they pulled her out of the vehicle, Ms. Jones (though fully conscious) went limp and presented as dead-weight. Consequently, Officers Long and Cuba held her up by her wrists—her arms straight out—which prevented her from dropping onto the concrete immediately next to the vehicle. [Long BC 1:24:49 - 1:25:00Z; Cuba BC 1:24:49 - 1:25:00Z; Abbett BC 1:24:56Z].

The two Officers immediately moved her approximately two feet from the vehicle to a raised concrete platform which separated the drive-through teller window in the bank building from a free standing, drive-through teller station. At this point, they held her a few inches above the concrete platform and lowered her onto her bottom and then on her back. Officer Long instructed her to get on her stomach and rolled her over, putting her hands behind her back. Officer Long first had one knee on the concrete and the other knee on Ms. Jones' bottom and then he straddled her while he cuffed her. In his deposition, Officer Long stated that he had been trained to straddle a suspect, male or female, to keep the suspect from rolling over. [Long dep. at 86-7]. It required 51 seconds for Officer Long to cuff and secure Ms. Jones. After Officer Long secured Ms. Jones, he lifted her to her feet, frisked her, and told her to sit against her vehicle.[4]

[Long BC 1:25:00 - 1:25:59Z].

Ms. Jones testified in her deposition that she was slammed onto the concrete, but the video directly contradicts this assertion. She was quickly lowered a few inches onto the concrete

---

[4] While Officer Long asked Ms. Jones if she had anything in her bra, he declined to frisk her bra.

platform. Twelve seconds elapsed from the time Officer Cuba opened the car door to the time Ms. Jones was placed onto the concrete platform. The majority of that time was spent extracting Ms. Jones from the vehicle because she was resisting the Officers and leaning back as they were trying to remove her from the vehicle.

As previously indicated, while Officers Long and Cuba were trying to convince the Joneses to step out of the vehicle, Officer Abbett positioned himself on the other side of the car near the driver's side window and asked Mr. Jones to exit the vehicle. Once Ms. Jones was on the ground, Officer Cuba leaned into the vehicle through the front passenger side door. He ordered Mr. Jones to, "get out of the car!" Upon seeing Mr. Jones' hand near the console, Officer Cuba drew his service weapon in his right hand. He ordered Mr. Jones out of the vehicle. He then he grasped Mr. Jones' right hand, which was near the console, with his (Cuba's) left hand and holstered his service weapon. The weapon was drawn for two seconds. [Cuba BC 1:25:02 - 1:25:28Z]. In the meantime, Officer Abbett had opened the driver's side door and ordered Mr. Jones to get out. [Abbett BC 1:25:16Z]. At Mr. Jones' request, Officer Abbett took both of Mr. Jones' wrists and, with Mr. Jones holding his hands in the air, Mr. Jones and Officer Abbett walked slowly and carefully to the trunk of the Jones vehicle. Officer Abbett put Mr. Jones' hands behind his back and cuffed him. [Abbett BC 1:25:17 - 1:25: 56Z]. Officer Cuba ducked into the back of the vehicle momentarily to check on the child who was still asleep. [Cuba BC 1:25:51Z]. Officer Abbett frisked Mr. Jones for weapons, and, finding none, escorted Mr. Jones to a standing position next to a patrol car. [Abbett BC 1:26:00Z].

Shortly thereafter, CPD Sergeant Cleveland arrived. [Cleveland BC 1:26:29Z]. Officer Cuba briefed Sgt. Cleveland on the situation and explained that the Joneses would not show identification or step out of the car. He also told Sgt. Cleveland that the child inside the car was

asleep. [Cuba BC 1:25:39Z; Cleveland BC 1:26:43 - 1:27:21Z]. Sgt. Cleveland then met with Ms. Jones to get her side of the story. Ms. Jones explained that they were there to make a night deposit when Officer Long walked up and said a bank alarm had been tripped. They told Officer Long why they were there. Sgt. Cleveland asked Ms. Jones if Officer Long had requested identification. She acknowledged that he did, but indicated that they did not furnish identification to him. When asked why, Ms. Jones stated, "[b]ecause my husband didn't feel the need that we need to give our identification when we were sitting here making a deposit." [Cleveland BC 1:27:30 - 1:28:28Z].

Sgt. Cleveland then approached Mr. Jones while he was standing next to the patrol car and asked for his version of events. [Cleveland BC 1:28:29Z]. Part of their conversation included the following:

Sgt. Cleveland: *So, talking about them pulling you out of the car. What happened prior to that? Did he ask for you IDs?*

Mr. Jones: *He asked for my ID.*

Sgt. Cleveland: *And you give that to him?*

Mr. Jones: *No Sir. I did not. I asked him a very legitimate question. I am not on a public road. I am here in my bank. I said, why do you need that when I am not on a public road?*

Sgt. Cleveland: *We patrol private property.*

Mr. Jones: *I totally get that. That's all he had to say. Instead of sticking his nightstick in my window and trying to force me out of the car.*

Sgt. Cleveland: *I see your side of the story. And I understand how that could be stressful. But, if an officer does ask for your IDs to check you out, instead of saying no, I'm not going to give that to you.*

Mr. Jones: *I never told him no, Officer.*

Sgt. Cleveland: *Well, your wife said you did.*

Mr. Jones: *I did not tell him that—I did not tell him, no. I asked him, why?*

Sgt. Cleveland: *But you didn't give him [unintelligible].*

Mr. Jones: Correct. *But I have the right to ask him why he needs it.*

Sgt. Cleveland: *You can say why as many times as you want, but when an officer asks you for your ID and you* [sic] *asking questions instead of being compliant, it causes a situation to escalate.*

Mr. Jones: *I understand. I'm standing here, I'm standing here in handcuffs. You see what I'm saying? I've not resisted anything. All I was doing was asking questions, exercising my rights. Why you need it? Sure, you give me a legitimate reason why you need it, I can give you that.*

[Cleveland BC 1:31:56 - 1:33:11Z].

After speaking with Mr. Jones, Sgt. Cleveland then spoke with Officer Abbett for his version of events. [Abbett BC 1:33:33 - 1:34:23Z, Cleveland BC 1:33:33 - 1:34:23Z]. While Sgt. Cleveland was conducting his investigation, Officer Cuba collected the Joneses' driver's licenses and ran them through a license database on his computer in the patrol car. [Cuba BC 1:29:16 - 1:31:10Z]. The license check revealed Brandon Jones' license was suspended. Officer Cuba told Officer Long and Sgt. Palmer of the CPD, who had also arrived on the scene, that Mr. Jones' license was suspended. [Cuba BC 1:34:22Z and 1:35:15Z]. When it started raining again, Officer Abbett moved Mr. Jones to a place where he could sit on the raised concrete under the awning to stay dry. [Abbett BC 1:42:35Z].

After Sgt. Cleveland finished speaking with Officer Abbett, he walked to his patrol car and turned off his body camera. [Cleveland BC 1:34:23 - 1:34:36Z]. During that time, he spoke to a district attorney. Sgt. Cleveland then spoke with Officer Long about charging the Joneses. [Long BC 1:47:50 - 1:48:50Z]. Sgt. Cleveland told Officer Long, "I think it's prudent" that Mr. Jones be arrested for resisting a halt, stop, and frisk and let Ms. Jones go to take care of her child. "Does that make sense?" [*Id.*]. Sgt. Cleveland also told Officer Long that there was no need for further

investigation into the tripped ATM alarm because they now had the Joneses' identification information and could follow-up with them if necessary. [Long BC 1:49:46Z].

After this consultation with Sgt. Cleveland, Officer Long told Ms. Jones that her husband was being arrested for resisting a stop and frisk, but she was being released to allow her to take her child home. He removed the cuffs. [Long BC 1:49:46 - 1:53:36Z]. Officer Long then told Mr. Jones he was being arrest for resisting a halt, stop and frisk, and he directed Mr. Jones into his patrol car. No force was necessary to put Mr. Jones in the patrol car. [Long BC 1:53:36 - 1:56:12Z]. In his deposition, Officer Long testified he also could have arrested Mr. Jones for driving with a suspended license in violation of Tennessee law. [Long dep. at 95-96].

While Officer Long was arresting Mr. Jones, Sgt. Cleveland walked over to Ms. Jones and told her that Mr. Jones was being arrested for resisting a halt, stop and frisk. He also told her that he could arrest her for that offense as well, but was allowing her to go home so that she could take care of her child. Sgt. Cleveland then spoke again with Mr. Jones at Mr. Jones' request. Mr. Jones asked how he could make a complaint. Sgt. Cleveland stated he could make a complaint with the department and "you're welcome to speak to our internal affairs." Sgt. Cleveland then allowed Ms. Jones to walk over and talk to Mr. Jones through the window while he was sitting in Officer Long's patrol car. After this conversation—approximately 40 minutes after Officer Long first arrived at the bank—Officer Long drove off the bank lot to transport Mr. Jones to the Hamilton County jail. They reached the jail about 20 minutes later. [Long BC 2:01:20 - 2:25:20Z]. Mr. Jones was booked, spent the night in jail, and was released the following morning on his own recognizance. Charges against Mr. Jones were dismissed nine months later.

### III. Analysis

#### A. Standard of Review

Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that matters—i.e., a fact that if found to be true, might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable substantive law provides the frame of reference to determine which facts are material. *Id.* A genuine dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky County*, 541 Fed. Appx. 653, 659 (6th Cir. 2013).

In deciding whether a dispute is genuine, the Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the Court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports v. Eliadis Inc.,* 253 F.3d 900, 907 (6th Cir. 2001). However, when the facts, as alleged by the non-moving party, are so clearly contradicted by the record that no reasonable jury could believe them, the court should not rely on those facts for purposes of ruling on the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (finding a plaintiff's description of police conduct that is blatantly contradicted by video does not create a genuine dispute of material fact); see also, *Coble v. City of White House,* 634 F.3d 865, 868-69 (6th Cir. 2011) (extending the reasoning in *Scott* to audiotape evidence).

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists. *Celotex Corp., v. Catrett*, 477 U.S. 317, 323 (1986); *Jones*, 541 F. App'x at 659. The moving party discharges its burden by either producing evidence that demonstrates the absence of

a genuine issue of material fact, or by simply showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp*. 477 U.S. at 325. To refute such a showing, the non-moving party must present some significant, probative evidence to support his or her claim. *Id*. at 322. The mere existence of a scintilla of evidence is not enough; there must be evidence on which a fair-minded jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 251-52. Conclusory allegations are insufficient to defeat a well-founded summary judgment motion. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (the object of this provision [Rule 56(c)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit).

### B. Discussion

#### 1. Overview of Plaintiffs' Claims

Plaintiffs bring this action under 42 U.S.C. § 1983 seeking monetary damages against the Defendant Officers alleging two grounds: (1) a violation of their substantive due process rights under the Fourteenth Amendment of the United States Constitution for deprivation of their liberty by conduct which shocks the conscience; and (2) wrongful detention of Plaintiffs by means of excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Plaintiffs also seek to hold the City liable for the actions of its officers pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Section 1983 is a remedial statute which does not itself create independent substantive legal rights. Section 1983 simply provides a vehicle by which a person may impose civil liability on state actors for a violation of rights secured to him by federal law. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollam*, 443 U.S. 137, 140 (1979)); *see also Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). To make out a claim under Section 1983, a plaintiff is required

to show that he has been deprived of a right, privilege, or immunity secured to him by the United States Constitution or other federal law and that the defendants caused the deprivation while they were acting under color of state law. *Gregory v. Shelby Cnty.,* 220 F.3d 433, 441 (6th Cir. 2000); *Baker v. Hadley,* 167 F.3d 1014, 1017 (6th Cir. 1999)), *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir. 1997).

There is no dispute that Officers Long, Cuba, and Abbett were acting under color of law at the time of the events giving rise to this action. The dispute centers on: (1) whether the Defendant Officers violated Plaintiff's substantive due process rights by engaging in conduct that shocks the conscience; (2) whether the Defendant Officers violated the Joneses' rights under the Fourth and Fourteenth Amendments to be free of unreasonable seizures; and (3) whether the City can be held liable for the Defendant Officers' conduct under *Monell v. Dep't of Soc. Servs*, 436 U.S. 658 (1978). The Court will address these claims *seriatim*.

### 2. Substantive Due Process Violation

Plaintiffs allege that Defendant Officers deprived them of substantive due process guaranteed by the Fourteenth Amendment by detaining them and by the manner in which they detained them. However, the Fourth Amendment via the Fourteenth Amendment—not substantive due process—is the proper vehicle through which Plaintiffs may bring their claim. This is so because, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1994)). Accordingly, Plaintiffs' claims of a substantive due process violation shall be dismissed with prejudice.

### 3. Plaintiffs' Claims for Unreasonable Seizure in Violation of the Fourth Amendment

The Fourth Amendment applies to the states through the Fourteenth Amendment. *Soldal v. Cook Cnty*, 506 U.S. 56, 61 (1992). The Fourth Amendment prohibits government actors from engaging in unreasonable search and seizure of persons, houses, papers, and effects. *Id.* Police may interact with citizens in three constitutionally permissible ways: (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause. *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)).

While consensual encounters are not subject to Fourth Amendment scrutiny, investigative detentions and arrests are subject to such scrutiny because both constitute detentions under the Fourth Amendment. *See Beauchamp*, 659 F.3d at 566 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). However, even if an investigative detention or arrest is initially constitutionally justified, it may not be effected by unconstitutional means. *See United States v. Martin*, 289 F.3d 392, 396-97 (6th Cir. 2002) (degree of intrusion used by officers during an investigatory detention must be reasonably related in scope to the existing circumstances); *Graham v. Connor*, 490 U.S. 386, 394-97 (1989) (officers cannot use excessive force to make an arrest). The Court will first examine whether Plaintiffs' detention was unconstitutional at its inception and, second, whether the degree of intrusion/force used to affect the detention fell outside constitutional boundaries.

### a. The Investigative Detention of the Joneses

A police-citizen encounter which starts as consensual can become a detention within the meaning of the Fourth Amendment "'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Hopkins v. Nichols*, __

F.4th __, 2022 WL 2168433, at * 2 (6th Cir. June 16, 2022) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). "A seizure of a person does not need to take the form of 'physical force;' rather, it can be "a 'show of authority' that 'in some way restrain[s] the liberty' of the person.'" *Hopkins*, 2022 WL 2168433, at *2 (quoting *Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989, 995 (2021)).

An investigative stop or detention, also called a *Terry* stop, is justified at its inception under the Fourth Amendment if specific and articulable facts give rise to a reasonable suspicion of criminal activity. *Hoover v. Walsh,* 682 F.3d 481, 494 (6th Cir. 2012) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion requires more than a mere hunch, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *see also Navarette v. California*, 572 U.S. 393, 397 (2014). This court must look at the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273; *Navarette,* 572 U.S. at 397. Reasonable suspicion can be based on information from other people provided the information is sufficiently reliable. *Navarette*, 572 U.S. at 397. An officer need not rule out innocent explanations in order to conduct an investigatory stop. *Navarette*, 572 U.S. at 403 ("we have consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'") (quoting *Arvizu*, 534 U.S. at 277). Rather, the investigatory stop is sufficient if it is "'justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Navarettee*, 572 U.S. at 401 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Even if the *Terry* stop is justified initially, the degree of intrusion during the investigative detention must be "reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding

circumstances." *Martin*, 289 F.3d at 397; *see also United States v. Rio*, 830 F.3d 403, 429 (6th Cir. 2016); *Wilkerson v. Warne*r, 545 F. App'x 413, 428 (6th Cir. 2013). "In determining whether an investigative stop is reasonably related to the basis for the original intrusion, the court considers the following factors: the length of the detention, the manner in which the detention was conducted, and the degree of force used." *Hoover*, 682 F.3d at 497-98 (citation cleaned up); *see also Dorsey v. Barber,* 517 F.3d 389, 399 (6th Cir. 2008) (same)). When evaluating the length of the detention, courts consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *Hoover*, 682 F.3d at 497-98. The means of the detention should be the least intrusive means necessary to dispel the officer's suspicions. *Florida v. Royer*, 460 US 491, 501 (1983); *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020). Lastly, the degree of force used should be reasonable considering the situation at hand. *See e.g., Dorsey*, 517 F.3d at 399 ("During a *Terry* stop, officers may draw their weapons or use handcuffs 'so long as circumstances warrant that precaution.'") (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir.2005)). Whether the force used is reasonable must be considered from the perspective of a reasonable officer on the scene, not with 20/20 hindsight after the incident. *Dorsey*, 517 F.3d at 399. When considering the reasonableness of an officer's use of force, the Court must consider that "police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (internal citations omitted). With these standards in mind for an investigative stop, the Court will evaluate the constitutionality of the Defendant Officers' conduct.

When Officer Long first approached Plaintiffs and asked what was going on and then asked for identification, he was engaging in a consensual encounter. An officer is permitted, under the Fourth Amendment, to ask a person for identification and this request alone does not render a

consensual encounter a detention. *Hiibel v. Sixth Judicial Court of Nevada*, 542 U.S. 177, 185 (2004). However, after the Joneses repeatedly failed to provide identification, and Officer Long insisted that they do so, Officer Long was "showing his authority" and a reasonable person would not have felt free to leave. At that point, a detention for investigatory purposes occurred.[5] Since the Longs were detained, the Court must next determine whether Officer Long was justified in doing so.

Police dispatch had notified Officer Long that a silent alarm for the ATM machine had been tripped at the First Volunteer Bank on Gunbarrel Road in Chattanooga, Tennessee. The Defendant Officers had previously been alerted that ATM thefts were on the rise in Chattanooga. Officer Long was aware that there had been a recent ATM theft at a First Volunteer Bank in the area using a skimmer device. When Officer Long arrived at the bank, at night, Plaintiffs were the only people on the premises. As Officer Long peered through the passenger side window, he saw a large amount of cash in the passenger's lap. While Plaintiffs explained they were making a night deposit, Officer Long was not required to take Plaintiffs' explanation at face value. *Criss v. Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman [ ] is under no obligation to give any credence to a suspect's story.")[6] The Court concludes Officer Long had a particularized and objective basis

---

[5] Mr. Jones complained to Sgt. Cleveland that when he (Jones) asked Officer Long if he was arrested, Officer Long said he was, but when Mr. Jones responded, "you're telling me I'm under arrest?", Officer Long said, "no, I didn't tell you are under arrest but you are detained at this moment." [Cleveland BC 1:29:32Z - 1:29:40Z]. It appears to the Court that Mr. Jones mistakenly believed *any* detention by police constituted an arrest requiring probable cause. As discussed herein, that is not the case. Had Mr. Jones understood that police can detain someone for a brief period of time on the basis of reasonable suspicion (a standard significantly below probable cause) to conduct an investigation, perhaps the outcome would have been different, but an officer is not required by the Constitution to explain constitutional law to a citizen. And, in any event, Officer Long did try to explain he could detain Plaintiffs and ask for their identification, but Mr. Jones refused to believe him.

[6] Courts have found that factual circumstances like these create reasonable suspicion of criminal activity justifying an investigatory stop. *See Oliver v. Woods,* 209 F.3d 1179, 1187-88 (10th Cir. 2000) (finding reasonable suspicion to stop early morning driver who triggered an infrared beam silent alarm placed across a parking lot entry of a car repair shop where police knew used oil had been illegally dropped there after hours); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) (finding reasonable suspicion to stop man walking away from a deserted area at night where security alarm had just gone off and suspect was the only person in the vicinity).

for suspecting wrongdoing which justified detaining Plaintiffs for investigative purposes. While it is now clear that Plaintiffs were indeed just making a night deposit at the bank, "*Terry* [*v. Ohio*, 392 U.S. 1 (1968)] accepts the risk that officers may stop innocent people" for a brief period of time to investigate when officers have a reasonable suspicion to believe criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). The next question is whether the investigatory stop was justified in scope.

[I]t is well established that an officer may ask suspect[s] to identify [themselves] in the course of a *Terry* stop. *Hiibel,* 542 U.S. at 186. "[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Id.*; *see also Barrera v. City of Mount Pleasant*, 12 F. 4th 617, 622 (6th Cir. 2021) ("an officer may ask a detained person to identify himself, so long as the request is reasonably related in scope to the circumstances which justified the stop.") (citation cleaned up). This authority stems from the fact that:

> [o]btaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere.

*Hiibel,* 542 U.S. at 186. Officer Long had a legitimate investigative reason for obtaining the Joneses' identification. By obtaining their identification information, Officer Long could release Plaintiffs, and, if video evidence from the bank later showed that Plaintiffs had been at the ATM at the time the silent alarm had been activated, police would have information to enable them to follow up on the investigation. This method was the least intrusive method available to Officer Long to investigate his reasonable suspicions that the Joneses may have attempted ATM theft. In fact, Officer Long told the Joneses that, if they produced valid identification and proof of insurance, they were "good to go."

In addition, in Tennessee, it is a Class C misdemeanor if a person operating a motor vehicle refuses to provide a valid driver's license upon request by a police officer. *See* Tenn. Code Ann. § 55-50-351.[7] Thus, there was an additional lawful basis for Officer Long to insist on seeing Mr. Jones' identification.

Unfortunately, the Joneses did not produce this information. Mr. Jones stated in his deposition that he did not *refuse* to produce his identification; rather, he simply asked why he needed to produce it. [B. Jones dep. at 26-30]. However, Mr. Jones asked questions *in lieu of* following lawful commands from police during a *Terry* stop. His failure to produce his license after multiple requests by Officer Long to do so constituted a *de facto* refusal to produce his license. This refusal to produce a driver's license raised further suspicions that something was amiss or that that Mr. Jones was hiding something. Finally, his patience exhausted, Officer Long ordered Mr. and Ms. Jones to exit the vehicle—a command which Officer Long was also constitutionally permitted to issue.

A police officer may, as a matter of course, order the driver and any passengers of a lawfully stopped vehicle to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1997) (drivers); *Maryland v. Wilson*, 519 U.S. 408 (1997) (passengers);*United States v. Prigmore*, 15 F.4th 768, 778 (6th Cir. 2021) ("Law enforcement may order passengers out of the vehicle during a traffic stop based on the weighty interest in officer safety and minimal intrusion on the

---

[7] Tenn. Code Ann. § Section 55-50-351 provides in relevant part:
      a) Every licensee shall have the licensee's license in immediate possession at all times when operating a motor vehicle and shall display it upon demand of any officer or agent of the department or any police officer of the state, county or municipality. . . .
      (b) A violation of this section is a Class C misdemeanor.
A Class C misdemeanor is punishable by up to 30 days imprisonment or a $50.00 fine or both. Tenn. Code Ann. § 40-35-111(e)(3) unless otherwise provided by a specific statute.

passenger's liberty.") (citation cleaned up). As the Supreme Court stated in *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1997) in regard to an officer's order to exit a vehicle,

> We think this additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a " 'petty indignity.'" *Terry v. Ohio*, *supra*, 392 U.S. at 17, 88 S.Ct. at 1877. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

Plaintiffs assert that the Supreme Court's holdings in *Pennsylvania v. Mimms* and *Maryland v. Wilson*—that an officer may lawfully order a driver and passenger to exit a vehicle—apply only to cases involving traffic stops for which there is probable cause to believe a traffic violation has occurred. Therefore, continues the argument, since Mr. and Ms. Jones were not detained in their vehicle on the basis of probable cause for a traffic infraction, Officer Long could not legally order them to exit their vehicle. This argument is incorrect. It is well settled that a person in a vehicle may be detained if there is probable cause to believe a traffic violation amounting to a civil infraction has occurred *or* if an officer has reasonable suspicion to believe an occupant of the vehicle has engaged, or is engaging, in criminal activity. *United States v. Pacheo*, 841 F.3d 384, 390 ("A police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity"); *United States v. Rios*, 830 F.3d 403, 429 (6th Cir. 2016)("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity") (citing *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)).

After being lawfully ordered to exit the vehicle, the Joneses did not do so. Mr. Jones asserted in his deposition that he did not know he was being detained by a police officer initially

because Officer Long was standing behind the passenger side window and Mr. Jones could not see him clearly.[B. Jones dep. at 20-21]. However, Officer Long's body camera recording in which Mr. Jones is heard addressing Officer Long as "officer" at the beginning of the encounter squarely contradicts this assertion. Further, Mr. Jones testified he knew Officer Long was a police officer when Officer Long stepped in front of the Jones vehicle [B. Jones dep. at 21], but even then he did not comply with Officer Long's lawful commands.

Officer Cuba then arrived on the scene. He, also, asked the Joneses—politely, calmly, and repeatedly—to "open the door," an implied request to exit the vehicle. Officer Abbett also calmly and politely asked Mr. Jones to exit the vehicle. Plaintiffs state that Officer Cuba "threatened" them with calling Child Protective Services. Indeed, Officer Cuba did calmly state that CPS would be called to pick up their child if they did not open the door; however, that statement was not a gratuitous threat. Rather, it was a statement of fact reflecting a likely outcome if they were both arrested for obstructing the Defendant Officers from conducting their investigation during a lawful *Terry* stop. Officer Long did sound frustrated at times with Plaintiffs' conduct, but mere frustration is insufficient to render this detention unreasonable given the Joneses' repeated refusals to follow very basic police commands.

After Plaintiffs ignored repeated requests to show identification, to open the car door, and to exit the vehicle, Officer Long and Officer Cuba made the decision remove the Plaintiffs by force—a decision within constitutional boundaries. *Graham v. Conner*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *see also Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) (same).

Once Officer Cuba opened the car door, both Officers Long and Cuba reached for Ms. Jones' wrists. Given the Plaintiffs' continued resistance to exiting the vehicle and the officers' concern for their personal safety, it was not unreasonable for them to hold Ms. Jones' wrists to remove her from the vehicle; however, as the officers attempted to gain control of Ms. Jones' wrists, she leaned in the opposite direction, resisted their efforts, and loudly yelled "HEY" and "WHOA" multiple times. As they attempted to extricate Ms. Jones from the front seat of the vehicle, she hit her head on the door frame while she was resisting their efforts. This mishap occurred because Ms. Jones refused to cooperate with the officers — not because they employed inappropriate or excessive force. And, in any event, it did not result in any sort of serious injury.

After Ms. Jones had been removed from the vehicle, the bodycam footage reflects that Officer Long *lowered* her to the ground; he did not slam her to the ground as alleged. Then, he quickly rolled her over, put his knee on her bottom, and straddled her to apply handcuffs to her wrists. Officer Long then helped her to her feet. Securing Ms. Jones took 51 seconds.[8] In the video, Ms. Jones did not appear to be in any physical pain. Further, while Plaintiffs ask for "medical expenses" in their amended complaint, [*See* Am. Complaint ¶¶ 63, 70], they do not allege that Ms. Jones received medical treatment for a physical injury nor do they allege that Ms. Jones suffered any specific physical injury at all.

With respect to Mr. Jones, Plaintiffs assert that Officer Cuba's action of pulling his weapon on Mr. Jones was excessive. The Court does not agree. Mr. Jones' hand was near the console where weapons are sometimes hidden. Mr. Jones had been argumentative and refused to comply with simple and repeated police commands. His erratic behavior created concern. For his own safety,

---

[8] After Officer Long put cuffs on Ms. Jones, he inserted a pen type device in a small hole at the base of either cuff. This action took several seconds.

Officer Cuba was justified in pulling his weapon for the two seconds it took him to grasp Mr. Jones' hand near the console. Mr. Jones then decided to cooperate and no more force (or showing of force) was necessary to remove him from the vehicle.

After each Plaintiff was secured, the Defendant Officers frisked them for weapons. The same factors which justified Officer Long's decision to instigate a *Terry* stop, to ask for identification, to order Plaintiffs to exit the vehicle, and to forcibly remove the Joneses from the vehicle, also gave the Defendant Officers reasonable suspicion to believe Plaintiffs had a weapon. *United States v. McMullin*, 739 F.3d 943, 946 (6th Cir. 2014) ("to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous") (citing *Arizona v. Johnson*, 555 U.S. 323, 326, 27 (2009)). The frisks performed by the Defendant Officers in this situation did not violate constitutional standards.

The Court concludes that the length of detention, the means of detention, and the degree of force used during the investigative detention were reasonable. Defendant Officers diligently pursued a reasonable line of investigation for a suspected ATM theft. The steps taken by the Defendant Officers—asking Plaintiffs for identification, telling Plaintiffs to exit the vehicle when they refused to provide identification, and using force to remove the Plaintiffs when they refused to comply—all constituted reasonable measures. Further, Officers Long and Cuba used no greater degree of force than was necessary to remove the Joneses from the vehicle. Officer Abbett did not participate in removing Ms. Jones from the vehicle, and used no force to remove Mr. Jones since Mr. Jones decided to cooperate. In sum, the degree of the intrusion of the investigative stop was reasonably related in scope to the situation at hand.

### b. The Arrest of Mr. Jones

"'A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.'" *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)). Police may arrest a suspect without a warrant provided they have probable cause to believe that a criminal offense has been or is being committed. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Probable cause exists "when, at the time of the arrest, 'the facts and circumstances within [the officer's knowledge] and of which [she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015)). In determining whether there is probable cause to make an arrest, the officer must consider the totality of the circumstances, including exculpatory evidence, before making an arrest. *Ouza*, 969 F.3d at 279 (citing *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "A showing of "probable cause provides a complete defense to a claim of false arrest." *Tlapamco*, 969 F.3d at 652 (citing *Halasah v. City of Kirtland*, 574 F. App'x 624, 629 (6th Cir. 2014)). The Court must look to state law to define the offense for which a plaintiff was arrested in a false arrest claim brought pursuant to 42 U.S.C. § 1983. *Wood v. Eubanks*, 25 F.4th 414, 421 (6th Cir. 2022). The plaintiff bears the burden to show the police lacked probable cause in order to prevail. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

> Under Tenn. Code Ann. § 39-16-602, it is a Class B misdemeanor in Tennessee to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

Tenn. Code Ann. § 39-16-602(a). A Class B misdemeanor is punishable by not greater than six months incarceration or a fine not to exceed $500.00. Tenn. Code Ann. § 40-35-111(e)(2).

In the instant case, the Defendant Officers assert they had probable cause to believe Mr. Jones had obstructed Officer Long and Officer Cuba from effecting the stop and subsequent frisk of Ms. Jones by using force against them when they tried to remove her from the vehicle. According to Officer Long and Officer Cuba, Mr. Jones put his arm across Ms. Jones' upper chest or head to prevent her from being removed. Mr. and Ms. Jones deny that Mr. Jones held onto her. The visual portion of the recording from the Defendant Officers' body cameras neither confirms nor refutes the competing contentions on this issue. The cameras do not show the upper portion of Ms. Jones' body at the critical moment. On the other hand, Officer Long can be clearly heard on the audio portion of the recordings telling Mr. Jones, during the tense struggle to remove Ms. Jones from the vehicle, "*get your hands off her right now. Get your hands off her!*" This sharp, excited utterance confirms Officer Long's and Officer Cuba's version of events: Mr. Jones was holding onto Ms. Jones to try and prevent her from being removed. Further, the manner in which Ms. Jones lurched forward after Officer Long made these statements is consistent with a person being suddenly released after being held back. Consequently, the Court concludes that Officer Long's body camera recordings unequivocally contradict the Joneses' contention that Mr. Jones was not holding onto her. Consequently, the Court further concludes that Officer Long had probable cause to arrest Mr. Jones for using force against the officers when he attempted to obstruct the police officer from effecting a stop, halt and frisk in violation of Tenn. Code Ann. § 39-16-602. [9]

---

[9] The Court also notes that Officer Long is heard in his video stating he had arrested Ms. Jones for a violation of Section 39-16-602(a) after he pulled her out of the vehicle, but, as discussed herein, Sgt. Cleveland later counseled him not to arrest Ms. Jones and to allow her to go home to take care of her child. Officer Long did as he was counseled. The Court finds, however, that Officer Long did have probable cause to arrest Ms. Jones for a violation of Section 39-16-602(a) because she

As an additional and independent basis for finding Mr. Jones' false arrest claim cannot survive summary judgment, the Court finds Officer Long had probable cause to arrest Mr. Jones for driving on a suspended license in violation of Tennessee law. In Tennessee, driving with a suspended license is a criminal violation. Tenn. Code Ann. § 55-50-504(a)(1) provides in relevant part:

> A person who drives a motor vehicle within the entire width between the boundary lines of every way publicly maintained that is open to the use of the public for purposes of vehicular travel, or the premises of any shopping center, manufactured housing complex or apartment house complex or any other premises frequented by the public at large at a time when the person's privilege to do so is cancelled, suspended, or revoked commits a Class B misdemeanor.

While Officer Long did not explicitly arrest Mr. Jones for driving with a suspended license, an officer's "subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004); *see also Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015) (An "officer can lawfully arrest the plaintiff so long as there is probable cause to arrest her for some crime, even if the crime for which there is probable cause is different from the stated crime of arrest"); *Jelsma v. Knox Cnty.*, No. 3:14-CV-351-TAV-CCS, 2016 WL 8678053, at * 3, (E.D. Tenn. July 6, 2016) ("The probable cause needs to be for some crime, even if different than the crime of arrest.") (citation cleaned up).

At the time Officer Long arrested Mr. Jones, he knew Mr. Jones' driver's license had been suspended. Thus he had probable cause to believe Mr. Jones was driving with a suspended license in violation of Tennessee law. As to Mr. Jones' excessive force claim arising from his arrest, when

_____

pulled away from the Officers to resist being removed from the vehicle when she was lawfully directed to do so by the Officers.

Officer Long placed Mr. Jones under arrest for obstruction of a stop, halt, or frisk, no force was used. Accordingly, Defendant Officers are entitled to summary judgment on this claim as well.[10]

### 4. Plaintiffs' Section 1983 Claim Against the City of Chattanooga

Plaintiffs assert a claim against the City of Chattanooga under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs allege the City has a policy, practice, or custom of deliberate indifference to citizens' constitutional rights by giving various supervisors unfettered discretion to oversee officer arrests and use of force and by ratifying "egregious conduct and behavior" of its officers which led to the Defendant Officers violating the Plaintiffs' constitutional rights. [Doc. 42, Am. Compl. ¶ ¶ 72-22]. However, the Court has already concluded that Officers Long, Cuba and Abbett did not violate the Plaintiffs' constitutional rights. It is well settled that a City cannot be held to be liable under Section 1983 where its officers have committed no underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 811 (1986); *Bruederle v. Louisville Metro Government*, 687 F.3d 771, 777 (6th Cir. 2012)). Accordingly, Plaintiffs' Section 1983 claim against the City shall also be dismissed.

---

[10] The Court has already found that the Joneses' removal from their vehicle was part of an investigative stop and have therefore examined the decision to remove them and the force used to do so under the standards applicable to an investigative stop.

**IV.** **Conclusion**

For the reasons stated in this Memorandum Opinion, it is hereby **ORDERED** that:

1. Defendant Officers' Motion for Summary Judgment [Doc. 186] is **GRANTED** and Plaintiffs' claims against the Defendant Officers are **DISMISSED**.

2. Defendant City of Chattanooga's Motion for Summary Judgment is **GRANTED** and Plaintiffs' claims against Defendant City of Chattanooga are **DISMISSED**.

3. Judgment shall **ENTER** on behalf of Defendants.
   .
**SO ORDERED.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE